**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:08CR00041 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CHARLES JERMAINE KING,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Jordan E. McKay, Special Assistant United States Attorney, Charlottesville, Virginia, for United States; Charles Jermaine King, Pro Se Defendant.*

Defendant Charles Jermaine King filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, alleging several grounds for relief, including his classification as a career offender and ineffective assistance by counsel at trial and on appeal. The United States responded, requesting that the motion be denied and King has replied, making the issues ripe for disposition. After review of the record, I will deny the defendant's 2255 motion.

I

A. BACKGROUND.

A grand jury of this court returned a twelve-count Indictment charging King and fifty other persons with conspiracy to possess with intent to distribute and to

distribute 50 grams or more of cocaine base and 500 grams or more of cocaine (Count One) (Case No. 1:08CR00024). King was represented by court-appointed counsel, Thomas E. Wray. On September 12, 2008, I dismissed the Indictment as to King without prejudice after the government conceded violations of King's rights under the Interstate Agreement on Detainers ("IAD").

On September 24, 2008, the grand jury returned a new Indictment against King, charging him with conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base. King twice moved unsuccessfully to dismiss this Indictment, first on double jeopardy grounds and later, after attorney David S. Saliba had been appointed his counsel in December of 2008, on the ground that coconspirator Paul Vaughn had recanted his prior testimony about the conspiracy.[1]

---

[1] The criminal complaint against King relied, in part, upon statements Vaughn made to authorities implicating King and others. Vaughn also testified before the grand jury and at the trials of some of the other coconspirators. In December 2008, before King's trial, Vaughn wrote the court claiming that his testimony had been false.

Vaughn did not testify at King's trial. In later proceedings in Case No. 1:08CR00024, I held that Vaughn's recantation and his subsequent versions of events were not credible. Specifically, some of King's codefendants who were tried separately moved for new trials based on the recantations by Vaughn and by two other recanting codefendants, Derrick Evans and Marcus Watkins. I conducted an evidentiary hearing in August 2009, during which these persons testified that they had lied during prior testimony. In light of all the evidence, I found that their recantations were false. Accordingly, I denied the motions for new trials. *United States v. Duty*, No. 1:08CR00024 at *14-15, 2009 WL 2424347 (W.D. Va. Aug. 6, 2009), *aff'd*, 441 F. App'x 138 (4th Cir. 2011) (unpublished); *United States v. Baumgardner*, No. 1:08CR00024, 2009 WL 2424334 at *16 (W.D. Va. Aug. 6, 2009), *aff'd*, 446 F. App'x

B. THE TRIAL.

King, Reginald Darwin Morton, and Tyson Anderson were tried together before a jury on May 26-29, 2009, on the conspiracy charges contained in King's second Indictment and the original Indictment in Case No. 1:08CR00024. On appeal, the Fourth Circuit summarized the trial evidence as follows:

> Morton and King were involved in a large drug trafficking conspiracy which operated in the Bristol, Virginia area. The conspiracy was orchestrated in large part by Derrick Evans, Kerry Lee, Bryant Kelly Pride, and Oedipus Mumphrey, all of whom were affiliated with Evans' music label, "Kan't Stop Records." Evans, Lee, Pride, and Mumphrey recruited several other participants, including Morton and King, to help sell cocaine and crack from area hotels, mobile homes, and locations controlled by Evans.
>
> Morton's involvement began in April 2006 when he traveled to Bristol with Mumphrey to sell between 500 and 1,000 grams of cocaine. Thereafter, Morton continued to sell crack cocaine to Bristol residents, several of whom testified against him at trial. The evidence also showed that Morton was present when Bristol police officers discovered baking soda, a hot plate, and other equipment used to prepare crack cocaine in a vehicle belonging to one of Mumphrey's associates.
>
> King's involvement was of a similar nature. He purchased large quantities of crack cocaine from Lee and Pride and then resold the drugs to third parties. At least six individuals testified that they bought crack cocaine from King, often on a recurring basis. One of these

---

218 (4th Cir.) (unpublished), *cert. denied*, 132 S. Ct. 2696 (2012); *see also United States v. Vaughn*, No. 1:08CR00024, 2009 WL 2762159 at *10 (W.D. Va. Aug. 27, 2009) (denying motion to withdraw guilty plea), *aff'd*, 462 F. App'x 315 (4th Cir.) (unpublished), *cert. denied*, 132 S. Ct. 2447 (2012); *United States v. Evans*, 635 F. Supp. 2d 455, 464-65 (W.D. Va. 2009) (same), *aff'd*, 462 F. App'x 315 (4th Cir.) (unpublished), *cert. denied*, 132 S. Ct. 2447 (2012).

> individuals executed a controlled purchase of crack cocaine from King in April 2007, which ultimately led to King's arrest and conviction in state court. Other witnesses linked King to Kan't Stop Records and several key members of the conspiracy, including Pride and Mumphrey.

*United States v. Morton*, 443 F. App'x 775, 777 (4th Cir. 2011) (unpublished), *cert. denied*, 133 S. Ct. 220 (2012).

On May 29, 2009, the jury found that King was guilty of the drug trafficking conspiracy and should be held accountable for "[l]ess than 50 grams but at least 5 grams" of cocaine base. (Verdict Form, ECF No. 104.)

C. SENTENCING.

As charged by the government in a Sentencing Enhancement Information (ECF No. 24) and admitted by King at sentencing, King had four prior North Carolina convictions for drug trafficking crimes, one in 1993 and three in 1998. The 1998 convictions all resulted in sentences of less than one year of incarceration, and the 1993 conviction (for conspiracy to sell or deliver cocaine and possession with intent to sell or deliver cocaine) resulted in a sentence of two years imprisonment, with execution suspended and placement on three years of supervised probation. (Gov't Ex. 1, Oct. 19, 2009, ECF No. 134-1.)

As a result of these prior convictions, King faced a 10-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(B), as well as a Career Offender enhancement under U.S. Sentencing Guidelines Manual ("USSG") § 4B1.1. At the

sentencing hearing, although King's attorney Saliba did not object to the Career Offender finding, he argued that because King received "sentences shorter than one year" for his North Carolina convictions, "[t]o preserve the record for appeal, [King] would object to the court's consideration of those convictions as felony convictions." (Tr. 7-8, Oct. 19, 2009, ECF No. 221.) I overruled the objection under the then-controlling precedent, *United States v. Harp*, 406 F.3d 242, 246 (4th Cir. 2005) (finding that prior North Carolina conviction was for a crime punishable by imprisonment for a term exceeding one year if any defendant charged with that crime could receive a sentence of more than one year).

Attorney Saliba also challenged the PSR's finding that King should be accountable for 419.8 grams of crack cocaine, resulting in a Base Offense Level of 32. Because I found that King was properly considered as a Career Offender, I ruled that it was "not necessary for me to determine the quantity of drugs attributable to [King] in order to calculate the proper guideline range." (Tr. 33, Oct. 19, 2009, ECF No. 221.) As a Career Offender, King had a Total Offense Level of 37 and a Criminal History Category of VI, which translated to an advisory custody range of 360 months to life in prison.

The government argued for a sentence within the guideline range, given King's criminal history and his level of involvement in and profit from the drug conspiracy. Saliba requested a sentence below that range to the mandatory

minimum of 10 years, based upon the jury's drug amount finding and a comparison to the coconspirators' sentences. I varied downward from the Career Offender guideline range and sentenced King to 180 months in prison. I also directed that his sentence run concurrently with a 35-month Virginia drug trafficking sentence imposed in March of 2008.[2]

### D. POSTJUDGMENT PROCEEDINGS.

King and Morton both appealed, and the two appeals were consolidated by the court of appeals. On King's behalf, Saliba argued that this court had erred in failing to dismiss the first Indictment with prejudice and in failing to dismiss the second Indictment based on Vaughn's allegedly false grand jury testimony; in denying a change of venue; and in denying judgment of acquittal based on alleged insufficiency of the evidence. *Morton*, 443 F. App'x at 779-80. Morton's appellate counsel argued, among other things, that Morton's prior North Carolina drug offense did not qualify as a felony predicate to increase his mandatory minimum sentence under § 841(b)(1)(A) because the offense was not punishable by any more than 10 months' imprisonment.[3] Saliba did not raise a similar

[2] This state sentence was not used to enhance King's federal sentence because the state case encompassed conduct charged in the federal case.

[3] *See* 21 U.S.C. § 802(44) (defining "felony drug offense" as a crime "punishable by imprisonment for more than one year").

appellate challenge concerning the use of King's prior North Carolina offenses to determine that he was a Career Offender.

On August 18, 2011, the court of appeals denied relief as to King's claims. The court expressly found that "the petit jury's guilty verdict, which was not based on any testimony from Vaughn, as he did not testify at [King's] trial, rendered 'any error in the grand jury proceeding connected with the charging decision . . . harmless beyond a reasonable doubt.'" *Morton*, 443 F. App'x at 778 (quoting *United States v. Mechanik*, 475 U.S. 66, 70 (1986)). The court reversed the judgment as to Morton, however, and remanded his case for resentencing in light of its day-old decision in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc). 443 F. App'x at 780.

King learned in January of 2012 that Saliba had not filed a petition for rehearing or a petition for a writ of certiorari on King's behalf. In February of 2012, King filed in the court of appeals a pro se Motion to Recall the Mandate. According to King, after Morton's case had been remanded for resentencing under *Simmons*, Saliba "assured that he would include the *Simmons* [challenge to King's Career Offender designation] in a Rehearing Petition or petition for writ of Certiorari," but failed to do so. (2255 Mem. Ex. I-1, at 5-6, ECF No. 206-14.)

Saliba filed a response to King's pro se motion, stating that King had no valid *Simmons* claim under § 841(b)(1)(B), because he had one prior conviction for

which he had been sentenced to more than one year. Saliba also moved to withdraw as counsel. The government then filed a brief, arguing that a recall of the mandate was not warranted because Saliba had not "conceded" that King asked him to seek certiorari and that valid tactical arguments existed in favor of foregoing such review. (*Id.* Ex. I-4, at 2.) The government asserted, however, that "since the predicate offenses resulting in career offender status under U.S.S.G. § 4B1.1 no longer qualify as felonies [in light of *Simmons*], it appears King was incorrectly characterized as a career offender for Guideline purposes." (*Id.* at 1.) However, on April 4, 2012, the court of appeals issued an order stating that "[u]pon consideration of submissions relative to the motion to recall the mandate, the court denies the motion." (*Id.* Ex. I-5.)

On June 6, 2012, King filed a pro se petition for a writ of certiorari. By letter dated June 13, 2012, the clerk of the Supreme Court informed King that his petition had been docketed with "a notation as to its untimeliness," because the petition had been due on November 16, 2011. (*Id.* Ex. H-3, ECF No. 206-13.) The Supreme Court ultimately denied the petition. *King v. United States*, 133 S. Ct. 220 (2012).

## E. 2255 CLAIMS.

In his § 2255 motion as supplemented by his later submissions,[4] King asserts repetitive, haphazardly numbered and unnumbered claims for relief. For clarity's sake, I will refer to and address his allegations under three general headings: court error (Claim A), prosecutorial misconduct (Claim B), and ineffective assistance of counsel (Claim C), and assign numbers to individual subclaims.

King's Claim A includes allegations that the court erred by: (1) calculating King's advisory guideline range under the Career Offender provision, in violation of *Simmons*; (2) denying King's Fifth Motion for Continuance filed so that Saliba could interview codefendant Paul Vaughn; (3) denying King favorable witnesses in his defense;[5] (4) submitting the case to the jury using a defective verdict form which included a drug amount option that did not apply to King; (5) engaging in ex parte communications with jurors regarding the amended verdict form and jurors' request for certain pieces of evidence; and (6) exhibiting racial bias against King.

Claim B alleges that the prosecutor committed misconduct by (1) eliciting testimony from Nicole Perez about her prior interactions with government officials

[4] (ECF Nos. 190, 194, 206, & 222.)

[5] This claim arises from King's attempt on the third day of trial to call Vaughn and Evans as defense witnesses against his attorney's advice. I denied King's request, advising him that, although he had a right to testify on his own behalf even against counsel's advice, "as to the calling of witnesses . . . and the presentation of other evidence, that is a matter within the hands of the attorney, that's why he's appointed to represent you." (Tr. 21, May 28, 2009, Case No. 1:08CR00024, ECF No. 2404.)

that he knew to be false; (2) eliciting testimony from Perez that conflicted with her earlier out-of-court statements; (3) improperly vouching for and bolstering Oedipus Mumphrey's credibility; and (4) stating facts not in evidence during closing argument.

In Claim C, King alleges various acts of ineffective assistance by attorney Wray (pretrial) and attorney Saliba (before, during and after trial).

King has also filed several motions regarding discovery, expediting disposition of certain claims, and appointment of counsel. I do not find that the pendency of these motions, which I will address separately, affects the ripeness of his present claims for consideration.

## II

### A. CLAIMS A AND B.

A collateral attack under § 2255 may not substitute for an appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982). Claims that could have been, but were not, raised on direct appeal are procedurally barred from review under § 2255, unless the defendant demonstrates cause for his default and actual prejudice or demonstrates a miscarriage of justice because he is actually innocent. *See Bousley v. United States*, 523 U.S. 614, 622 (1998). To establish actual prejudice in this context, the defendant must show that the errors he alleges caused not just the

"possibility of prejudice"; he must show that they "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Fraley*, 456 U.S. at 170. This prejudice standard is a "significantly higher hurdle than would exist on direct appeal" under the plain error standard. *Id.* at 166 (footnote omitted).

King did not raise Claims A (court errors) and B (prosecutorial misconduct) on direct appeal. Therefore, they are procedurally defaulted from federal habeas review, unless he demonstrates cause and prejudice or a miscarriage of justice. King argues that he can establish ineffective assistance of counsel as cause to excuse his default of all claims of court error and prosecutorial misconduct. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). If King fails to establish actual prejudice resulting from these alleged errors, I need not determine whether he has shown adequate cause for the defaults. *Frady*, 456 U.S. at 168.

1. *Actual Prejudice*.

I agree with the government that, given the strength of the evidence against King, the errors he alleges in Claims A(2) through A(6) and B lack the scope necessary to infect the entire trial with error as required to show actual prejudice under *Frady*. In addition, several of these errors have no factual basis in the record. Because I find that King fails to establish actual prejudice resulting from

these alleged errors, I need not determine whether he has shown adequate cause for the defaults.[6] *Id.*

The errors King alleges in Claims A(2)-(6) did not infect his entire trial. King and his attorney had ample time to prepare his defense without the fifth continuance he requested. Moreover, King has not offered evidence that his inability to interview Vaughn before trial or to call him and other recanting codefendants as defense witnesses deprived King of credible, exculpatory evidence or otherwise caused him any prejudice. Indeed, after conducting an evidentiary hearing on the issue of Vaughn's credibility, I noted "abundant corroboration of [Vaughn's] deep involvement in this conspiracy" and found that much of his post-recantation testimony was "simply preposterous [and] incredible on its face." (Tr. 106, Aug 4, 2009, Case No. 1:08CR00024, ECF No. 2479.)

I also cannot find any likelihood that King was prejudiced by the defect in the initial verdict form provided to jurors. This form included an option for the jurors to state whether 500 grams or less of cocaine was attributable to King, a charge not made against King in his second Indictment. On the corrected verdict

[6] In any event, King has not shown cause. Attorney error at trial or on appeal can serve as cause for default only if it amounts to a violation of the defendant's constitutional right to effective assistance. *Edwards*, 529 U.S. at 451. For the same reasons that King fails to show actual prejudice under *Frady* as to Claims A(2)-(6) and B, he also fails to satisfy the prejudice prong of the two-part standard in *Strickland v. Washington,* 466 U.S. 668, 687 (1984) (finding that ineffective assistance of counsel claim requires showing of (a) deficient performance and (b) prejudice, namely, that but for counsel's error, no reasonable probability exists that the outcome would have been different).

form, the jury found King guilty of distributing less than 50 but at least 5 grams of cocaine base. Indeed, the jurors' finding reflects that they were not adversely influenced by the higher amount of cocaine listed on the initial verdict form. Similarly, King has not shown that I influenced the jury against King's case in any way by correcting the verdict form and providing it to jurors outside the defendant's presence. *United States v. Parsons*, 993 F.2d 38, 41-42 (4th Cir. 1993) ("Even if [defendant's] right of presence was violated, reversal is not required unless the error was harmful.")

Finally, I find no factual basis for King's Claim A(6) that I showed racial bias against him. In denying his request to call the recanting codefendants as defense witnesses against his counsel's advice, I was merely applying established law.[7] *See, e.g.*, *Sexton v. French*, 163 F.3d 874, 887 (4th Cir. 1998) ("The decision

---

[7] King disagreed with my ruling and declared, "I'm being prejudiced in this court"; he also stated that he would not return to the courtroom. (Tr. 25, May 28, 2009.) I explained that King had a right to be present or not, at his choice. King continued talking, as follows:

> KING: Sir, I think this is unjust and I'm being prejudiced because I'm Black. I think I'm being prejudiced by the Court —
>
> COURT: Yes, sir.
>
> KING: — and I think you know it.
>
> COURT: Yes, sir.
>
> KING: I hope this is on the transcript, too.

concerning what evidence should be introduced [in criminal trial proceedings] is best left in the hands of trial counsel, and reasonable tactical decisions by trial counsel in this regard are binding on the defendant."). Moreover, as already discussed, given the compromised credibility of these witnesses, I cannot find that King's inability to present their testimony harmed his defense in any respect.

Similarly, King does not show actual prejudice he suffered from the prosecutorial misconduct alleged in Claim B. The testimony of Perez and Mumphrey was not the only evidence offered during the government's case to establish that King was involved in the Kan't Stop Records drug conspiracy and that he regularly sold crack cocaine. Kerry Lee, the main supplier of cocaine to Derrick Evans, testified that King had purchased distribution amounts of crack cocaine from Lee and from Bryant Pride. Susie Garrett and Tim Norton testified that they purchased crack from King, and Tammy Stallworth testified that she had bought crack from King and knew him to sell drugs. Their testimony about King's drug dealing was corroborated by the controlled purchases of crack cocaine from King to which he had pleaded guilty. All of these witnesses testified about pleading guilty and cooperating with the government in the hope of a less severe sentence, and many also testified about their prior felony convictions. In light of

---

(Tr. 26-27.) King's interpretation of my responses is disingenuous. On the contrary, my words to King and the record as a whole indicate nothing more than my respect for King's opinion.

this record, I cannot find that the prosecutor's alleged errors regarding Mumphrey and Perez undermined the fairness of King's trial to any significant extent.

For these reasons, I cannot find that King has shown actual prejudice as required to excuse his procedural defaults of Claims A(2) through A(6) and B. Therefore, I need not consider whether King has shown cause for these defaults in order to find them procedurally barred from federal habeas review under § 2255. *Id.* at 168.

2. *Default of Simmons Claim.*

I find that a separate, more detailed cause and prejudice analysis is warranted for Claim A(1), alleging that the court's designation of King as a Career Offender was erroneous in light of *Simmons*. The parties agree that King no longer qualifies as a Career Offender under USSG § 4B1.1(a). This fact does not, however, prove that he has suffered any injustice in sentencing to warrant relief under § 2255.[8] For reasons I will address in the discussion of Claim C, alleging ineffective assistance of counsel, I find that King has shown neither cause nor actual prejudice to excuse the default of his *Simmons* argument in Claim A(1).

[8] King has moved for summary judgment (ECF No. 220) on his claim that his Career Offender designation is now unlawful, based on the government's concession of this fact and asserts that he should be immediately resentenced. The government, however, argues that King should not be resentenced under *Simmons*. Because King fails to demonstrate that he is entitled to § 2255 relief on this claim as a matter of law, I will deny his Motion for Summary Judgment.

3. *Actual Innocence*.

The court must determine the merits of all procedurally defaulted claims if it finds a fundamental miscarriage of justice exists because the petitioner is actually innocent. *See Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new [and reliable] evidence [not presented at trial], it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536-37 (2006) (internal quotation marks and citation omitted).

King argues that even if he cannot show cause for his defaults, the court should address the defaulted claims to prevent a fundamental miscarriage of justice, because of his claim of innocence. In support of this argument, King refers to Saliba's alleged deficiencies in failing to impeach key prosecution witnesses and to subpoena exculpatory witnesses to contradict them. King does not, however, present new and reliable evidence that would persuade a reasonable juror of his innocence. Even if I were to reverse my ruling and find that the recantations by Evans, Watkins, and Vaughn were true, the testimony of other witnesses who have not recanted, the controlled buys the confidential informant made from King, and the physical evidence, establish King's guilt on the drug conspiracy charge.

Therefore, I cannot find that King's evidence presents a colorable claim of actual innocence warranting an exception to default.

Because King has not shown actual innocence, has not shown actual prejudice under *Frady* as to Claims A(2) through A(6) and B, and has not shown cause and actual prejudice as to Claim A(1), I find that these claims are procedurally barred.

B. CLAIM C.

To prove that counsel's representation was so defective as to require reversal of the conviction or sentence, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation. *Strickland*, 466 U.S. at 669. The defendant must overcome a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. *Id.* at 689.

In addition, the defendant must show prejudice — by demonstrating a "reasonable probability" that but for counsel's errors, the outcome would have been different. *Id.* at 694-95. If it is clear that the defendant has not satisfied one prong of the *Strickland* test, the court need not inquire whether he has satisfied the other prong. *Id.* at 697. This same two-part standard also applies to claims that counsel's representation during appeal proceedings was ineffective. *See Smith v.*

*Robbins*, 528 U.S. 259, 289 (2000). In a § 2255 motion, the defendant bears the burden of proving his claims by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

1. *Attorney Wray*.

King faults attorney Wray for (1) failing to properly argue his Motion to Dismiss Indictment; (2) failing to review discovery with King; (3) preventing King from speaking on his own behalf; and (4) attempting to coerce King to plead guilty. King has not established that any of these alleged errors violated his constitutional rights under the *Strickland* standard.

In Case No. 1:08CR00024-006, I referred King's pretrial motions to United States Magistrate Judge Pamela Meade Sargent. Judge Sargent issued a Report and Recommendation ("Report") finding merit to Wray's arguments that the Indictment should be dismissed because delay of King's trial had violated his rights under the anti-shuttling provisions of the IAD, 18 U.S.C. app. 2 § 2. Judge Sargent recommended dismissal without prejudice based upon the applicable factors listed in section 9 of the IAD. She pointed out that the motion referred to reasons "set forth in his supporting memorandum," but did not include such a memorandum. (Case No. 1:08CR00024-006, Report 8 n.1, ECF No. 623.)

After finding an IAD violation, the court must consider certain factors in deciding to dismiss the indictment with or without prejudice, which are: "The

seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice . . . ." 18 U.S.C. app. 2 § 9. The seriousness of the offense in this context depends in part upon "the nature of the conduct charged and the potential sentence." *United States v. McKinney*, 395 F.3d 837, 841 (8th Cir. 2005). The court is limited to consideration of the factual matter alleged in the charging documents and has no "'authority to review the sufficiency of evidence supporting an indictment.'" *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (quoting *United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003) (footnote omitted).

King's Claim C(1) asserts that Wray was ineffective in failing to file a memorandum presenting facts in support of dismissal *with prejudice*. Specifically, King contends Wray should have argued that King's drug charges were not "serious" within the meaning of § 9, because the government's "confidential sources and various co-defendants['] implications that formed the charges against petitioner did not corroborate with each other." (Def.'s Mem. 17, ECF No. 206-4.) In Claim C(2), King complains that Wray prevented King himself from telling the court why his offense was not serious.

I find no merit to King's arguments. Lack of a memorandum from Wray or allocution from King notwithstanding, Judge Sargent's Report discussed at length

the relevant factors under section 9, including the seriousness of the offense. After review of the Report and King's objections, I adopted Judge Sargent's finding that King's offense was serious because he faced a mandatory minimum sentence of 10 years in prison and the charging documents indicated his involvement in a complex and long-term drug trafficking conspiracy involving a large amount of controlled substances. The inconsistencies between witnesses' accounts that King highlights do not refute the factual basis for the court's finding that his offense was serious. Moreover, I had no authority to consider witness credibility and consistency in deciding a pretrial motion seeking to dismiss an indictment. *Wills*, 346 F.3d at 488. Thus, I find no reasonable likelihood that if counsel had presented the evidence and argument King now proffers, I would have found grounds to dismiss the Indictment with prejudice.

Claim C(2) has no factual basis. The record clearly reflects that I, and not Wray, made the decision not to allow King to speak in support of dismissal with prejudice. After presenting his own oral argument on this issue, Wray stated, "Mr. King wants to address the court on this matter, but I'm not sure the court wants him to do that." (Tr. 7, Sept. 11, 2008, Case No. 1:08CR00024, ECF No. 2599.) I stated, "No, sir. Mr. King has counsel, and you've argued his motion, so if there's nothing further from counsel, I've considered the matter carefully." (*Id.*) Claims

C(1) and C(2) thus fail under the prejudice prong of *Strickland*, and I will deny relief.

King's Claim C(3) asserts that Wray was ineffective because he admitted to the court that he had not reviewed the discovery materials with King. After terminating Wray as counsel, however, the court appointed Saliba to represent King and granted three continuances before trial to allow adequate preparation time. King fails to demonstrate any likelihood that earlier review of discovery materials with Wray would have resulted in a different outcome at any stage of the proceedings. Accordingly, I find that Claim (3) fails under the prejudice prong of *Strickland* and will deny relief.

In Claim C(4), King faults Wray for allegedly attempting to coerce King to plead guilty. Because King did not plead guilty and proceeded to trial with different counsel, I cannot find any respect in which he has established any prejudice resulting from Wray's advice that King might benefit from a plea bargain. I will deny relief on this claim under the prejudice prong of *Strickland*.[9]

[9] King also argues that Wray's alleged errors, taken cumulatively, constituted ineffective assistance of counsel under *Strickland*. For the reasons discussed, however, I find that King fails to demonstrate prejudice under *Strickland* resulting from Wray's representation, whether counsel's alleged errors are viewed individually or in the aggregate.

2. *Attorney Saliba*.

Continuing with Claim C, King alleges that attorney Saliba provided ineffective assistance when he (5) failed to file a notice for an alibi defense; (6) failed to investigate, interview, and subpoena potential defense witnesses; (7) changed the defense strategy by failing to call key defense witnesses; (8) failed to use exculpatory statements of codefendants and informants; (9) failed to use available information to impeach government witness Kerry Lee and Nicole Perez; (10) misstated evidence during his closing; (11) failed to object when the prosecutor misstated facts not in evidence in his closing; (12) failed to object to the court's impermissible contact with the jury; (13) failed to object to the court submitting a defective verdict form to the jury; (14) failed to object to the misapplication of § 5G1.3 regarding concurrent sentences; (15) failed to raise an appellate challenge to King's Career Offender status under *Simmons*; (16) failed to withdraw as appellate counsel; and (17) failed to file a petition for rehearing en banc or writ for certiorari. In addition, King claims (18) that all of these errors, taken cumulatively, caused prejudice to his case.

For reasons herein stated, I find that King has failed to state facts on which he could establish that any of Saliba's alleged errors constituted ineffective assistance under the *Strickland* standard.

a. *Alibi Defense*.

King asserts in Claim C(5) that Saliba should have given notice of an alibi defense, based on King's incarceration in prison from 2002 to 2004. His incarceration is not sufficient support for an alibi defense, however. The Indictment and the trial evidence indicated that the cocaine conspiracy began in 2003 and operated until April of 2008. Based on testimony from Tammy Stallworth and Susie Garrett, the government argued that King joined the conspiracy sometime around 2005. (Tr. 131, May 26, 2009, Case No. 1:08CR00024, ECF No. 2378; Tr. 14-16, May 27, 2009, Case No. 1:08CR00024, ECF No. 2383.) Saliba's failure to file notice of an alibi that did not exist was neither deficient performance nor prejudicial to King's case under the *Strickland* standard.

b. *Potential Defense Witnesses*.

Claims C(6) and C(7) assert that Saliba committed prejudicial error when he failed to investigate, interview, and subpoena key witnesses such as Derrick Evans, Paul Vaughn, Marcus Watkins, Chris Pressley, and Edward Deboard. King also contends that Saliba's initial defense plan included these witnesses, but that Saliba

changed course during the trial over King's objections and decided against calling them.[10]

All of these coconspirator witnesses were already discredited to some degree by their convictions and their established motive to offer assistance to law enforcement in exchange for the potential of less prison time. Additionally, Saliba's affidavit and the record provide specific and unrefuted evidence that Saliba did investigate these witnesses. An investigator retained by Morton's attorney interviewed Evans.[11] Saliba states that he reviewed statements and affidavits by Evans, Vaughn, and Watkins and was prepared to cross examine them if they testified against King. They did not. King does not provide evidence of any specific, favorable information Saliba would have learned or obtained for the defense if he personally had interviewed all of these witnesses.

Saliba also states that he considered calling these men as exculpatory witnesses or on rebuttal. For example, Evans had stated that he and Kerry Lee

---

[10] In arguing his ineffective assistance claims, King repeatedly relies on the fact that Saliba indicated his intent to pursue one course of action and then failed to do so. For example, Saliba "stated that he was going to call [Watkins, Vaughn and Evans]" as trial witnesses, but "failed to do so." (King Aff. 4, ECF No. 206.) Counsel's change in trial strategy alone does not constitute ineffective assistance under *Strickland*.

[11] King alleges that Saliba promised to hire an independent investigator, after King allegedly learned that Morton's investigator was the son of the United States Marshal. To the extent that King raises a separate ineffective assistance claim based on these facts, it fails under *Strickland*. He presents no specific favorable evidence that an independent investigator would have discovered or any reasonable probability that the outcome would have been different with another investigator assisting his defense.

concocted false evidence about the conspiracy to tell to authorities, and Lee testified against King. Saliba decided against calling Evans and the others for several reasons:

> [Counsel] had no idea how [Evans, Vaughn, and Watkins] would testify under oath [and] if they testified King had no involvement in the conspiracy, . . . the government could then cross examine each of them and introduce their prior testimony, much of which implicated King in the conspiracy, and if they took the stand on King's behalf and stuck with their original statements, they would actually implicate him rather than demonstrate his innocence, and [King] would not be able to impeach [his] own witness.

(Saliba Aff. 2, Feb. 19, 2013, ECF No. 212-1.) Ultimately, Saliba and counsel for Morton and Anderson decided against calling these witnesses because anything exculpatory that they might say would have had "almost no credibility given their numerous conflicting statements," and the risk that they would give testimony implicating King was too great. (*Id.*)

King fails to demonstrate that Saliba's tactics regarding Vaughn, Evans, and Watkins were unreasonable. Counsel's decision whether or not to call a witness whose potential testimony is unpredictable is a prime example of a reasonable strategic choice that the court cannot second-guess. *See United States v. Terry*, 366 F.3d 312, 316-18 (4th Cir. 2004) (finding that counsel's decision not to call "three inmates who allegedly could have offered exculpatory testimony" as witnesses was not below "wide range of professionally competent performance"). King does not present any affidavits from these witnesses, indicating that they

would have provided testimony exculpatory to King at trial. *See, e.g.*, *Burger v. Kemp*, 483 U.S. 776, 793 (1987) (rejecting ineffective assistance claim regarding uncalled witness because habeas petitioner did not present affidavit from witness "establishing that he would have offered substantial mitigating evidence if he had testified"); *Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir.1990) (rejecting claim that counsel was ineffective in failing to call witness because habeas petitioner did not proffer testimony witness would have given).

Even if King could show that one or more of these witnesses would have testified that King was not involved in the conspiracy, he cannot show any reasonable probability that the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. Cross examination using their prior testimony about King's participation in the conspiracy would have destroyed their credibility and bolstered the testimony offered by other prosecution witnesses regarding King's involvement with the conspiracy.

I also rest my finding of no prejudice under *Strickland* on my rulings after King's trial that these witnesses' recanted testimony denying the conspiracy was not credible. *See, e.g.*, *Duty*, 2009 WL 2424347, at *10 ("Because I find that the recantations of Vaughn, Evans, and Watkins are not credible, I do not believe that their trial testimony was false.")

King also asserts that Saliba should have called Pressley and Deboard to impeach Kerry Lee. He presents copies of letters from these men stating that Kerry Lee fabricated his testimony about King and the conspiracy.[12] At King's trial, however, Lee himself admitted that he had temporarily changed his story about the conspiracy. Lee had written the court a letter in 2009, claiming that he had been forced to plead guilty, was not guilty of conspiracy, and had offered false testimony. When asked during King's trial if the 2009 letter was true, Lee said, "No," and testified that King had helped him write it.[13] (Tr. 59, May 28, 2009, Case No. 1:08CR00024, ECF No. 2404.) Lee further testified that he was guilty of conspiracy and that his letter denying that fact was false. (*Id.* 108.)

[12] Pressley's letter states that he overheard Kerry Lee say "he was co[erced by the government" to lie about King. (2255 Mem. Ex. F-4, ECF No. 206-12.) Deboard's letter states that he overheard Evans describe how he and Kerry Lee made up lies about the drug trafficking and heard Evans say he told agents that King did not buy drugs from or sell drugs for him. (2255 Mem. Ex. F-5, ECF No. 206-12.)

[13] Lee identified part of Defense Exhibit 2 as one of two letters his attorney had sent him about Vaughn's retractions of prior statements. (Tr. 106, May 28, 2009, Case No. 1:08CR00024, ECF No. 2404.) Lee denied writing this letter himself, but agreed that anyone could have written it, including King. (*Id.* 125.) King asserts that this exchange prejudiced him and faults Saliba for failing to call rebuttal witnesses.

I find neither deficient performance nor prejudice under *Strickland* here. I instructed the jury to consider the Vaughn retraction letter "only for the purpose of determining the credibility of the witness Kerry Lee, and not for the truth of what [was] stated in the document purportedly written by Mr. Vaughn." (*Id.* 129.) Saliba reasonably could have believed this cautionary instruction to be sufficient protection against jurors blaming King for the Vaughn retraction letter. Furthermore, I find no reasonable probability that, absent Saliba's failure to call rebuttal witnesses about this document, the outcome of King's trial would have been different.

In light of Lee's admissions, I cannot find that Saliba acted unreasonably in failing to present testimony from Pressley and Deboard. Even if these men had been willing to testify for King, consistent with their letters which are not affidavits, I find no reasonable probability that their testimony would have persuaded jurors that Lee's letter was more credible than his trial testimony that the statements in the letter were not true. Moreover, Lee's testimony was corroborated by other witnesses who did not recant, and by the prior testimony of Vaughn, Evans, and Watkins, whose recantations I found incredible. Claims C(6) and (7) fail under both prongs of *Strickland*.

c. *Impeachment Materials*.

In Claim C(8), King asserts that Saliba should have used exculpatory statements from coconspirators such as Evans, Vaughn, and Watkins. Because these witnesses did not testify against King, however, counsel was not ineffective in failing to use their recantation statements for impeachment purposes.

In Claim C(9), King argues that Saliba should have impeached Kerry Lee by questioning him about a .45-caliber handgun and bag of cocaine that Lee possessed at the time of his arrest and about Lee's prior statement to authorities about his drug sales to King. I find no merit to this claim. Saliba chose to cross examine Lee about his Plea Agreement, which elicited Lee's incentive to testify against King. Since Lee had already admitted to his drug trafficking involvement, I find

that Saliba acted reasonably in deciding not to question Lee about the handgun and cocaine found during Lee's arrest.

I also find reasonable Saliba's decision against questioning Lee about discrepancies between his proffer and his trial testimony. At trial, Lee testified that he did not know what King did with the cocaine Lee gave him. (Tr. 71, May 28, 2009, Case No. 1:08CR00024, ECF No. 2404.) During Lee's proffer, he told agents that King would resell the cocaine he bought from Lee. (Def.'s Mem. 39, ECF No. 206-4.) Questioning Lee about the discrepancy between the two accounts would have strengthened the evidence connecting King to the drug trafficking conspiracy. Thus, Saliba's tactics concerning Lee's proffer were neither professionally deficient nor prejudicial under *Strickland*.

King also alleges that Saliba was ineffective for failing to impeach government witness Nicole Perez with evidence of her prior interactions with government officials. According to King, Perez met with authorities two times, but testified that she met with them only once. Although Saliba did not offer evidence to prove Perez lied, his questioning of her suggested to the jury the absurdity of her testimony that her first and only meeting with authorities occurred one week before King's trial.[14] Moreover, Saliba impeached Perez's credibility

[14] For example, "And you're saying out of the blue they needed to come talk to you Friday about testifying?" (Tr. 162, May 26, 2009, Case No. 1:08CR00024, ECF No. 2378.)

with other evidence, such as her Plea Agreement and hope for a lighter sentence, her drug addiction and prior offenses, and her vague testimony about the quantity of cocaine she claimed to have seen King purchase from Bryant Pride. I cannot find that these strategic choices Saliba made were unreasonable, or that his failure to explicitly expose her lie about her prior meetings with officials prejudiced King.[15]

d. *Closing Argument*.

King asserts in Claim C(10) that Saliba was ineffective during his closing, when he erroneously described testimony from Mumphrey and Perez. I find no factual basis for this claim.

King quotes the following section of Saliba's closing argument:

> Oedipus Mumprey, he came, he came into court. What did he say about Charles King? Did he say "Yeah, he's one of my dealers. Yeah, I was giving him this, I was giving him that. He was hustling for me." He didn't say that. A buy slash sell arrangement. He said he might have sold once to Charles. Once. Do you know what he was doing with it? No. Do you know what any of the guys were doing with it? No.

(Tr. 75-76, May 29, 2009, Case No. 1:08CR00024, ECF No. 2380.) King claims that Mumphrey never testified that he "might have sold once to Charles." The

---

[15] In this § 2255 action, King moved for discovery related to his claims about Nicole Perez, which the court denied. King has moved for reconsideration. Because I find that King has no viable claim concerning Perez, I also cannot find that he has shown good cause for the discovery he requested. Therefore, I will deny his motion (ECF No. 219.)

record reflects otherwise. Mumphrey testified that, on one occasion, a girl named Amanda and her boyfriend named Charles "helped me get rid of" cocaine that Mumphrey brought from North Carolina to Bristol for resale. (Tr. 123-24, May 27, 2009, ECF No. 151.) Thus, Saliba did not incorrectly summarize Mumphrey's testimony.

Moreover, Saliba's brief discussion of Mumphrey's vague mention of "Charles" was only a small part of his closing argument, which emphasized that none of the major players in the conspiracy (Evans, Pride, Vaughn, Watkins, or Mumphrey) testified that Charles King bought from or sold drugs for them. I cannot find that this closing strategy was unreasonable or prejudicial to King.

King also asserts that Saliba misstated testimony from Perez during his closing argument, as follows:

> Charles was doing rap music, he's in the studio, he's with these guys constantly, yet all these people that came in to testify can't say that he was getting drugs from any of the upper level people.
>
> . . . .
>
> Well, maybe one person did, Ms. Perez. . . . I asked her, "You'd do anything for your child, wouldn't you?" And she said, "Yes.". . . *You heard her testify that she drove Oedipus Mumphrey*. You heard her testify that she knew Charles was getting crack because she would hold it, and they'd give it back, and they'd sell it. Does that make any sense?

(Tr. 80-81, May 29, 2009, Case No. 1:08CR00024, ECF 2380) (emphasis added). The transcript reflects that Perez testified about driving Bryant Pride to drug

transactions and seeing him sell drugs to King. Saliba merely switched the names of the two drug dealers, an isolated and minor misstatement not likely to have confused jurors when taken in context with the rest of Saliba's closing.[16]

In any event, I instructed jurors to consider the witness testimony, not the lawyers' arguments, as evidence. Kerry Lee testified that King purchased distribution amounts of crack cocaine from him and from Bryant Pride, while other witnesses established that King regularly sold crack out of residences that Evans rented for the purpose of selling drugs. Thus, King has not demonstrated a reasonable probability that, but for Saliba's mentions of Mumphrey during the closing, the outcome at trial would have been different, and Claim C(10) fails under both prongs of *Strickland*.

King alleges in Claim C(11) that Saliba should have objected when the prosecutor misstated during his final closing that Mumphrey had testified about selling "some halves, quarter ounces" of cocaine to King. (Tr. 89, May 29, 2009, Case No. 1:08CR00024, ECF No. 2380.) The government concedes that Mumphrey did not testify about selling any particular quantity of the drug to

[16] Earlier in his closing, Saliba emphasized that Mumphrey did *not* testify that King was "one of his dealers." (Tr. 76, May 29, 2009, Case No. 1:08CR00024, ECF No. 2380.)

King.[17] (United States' Resp. 19, ECF No. 212.) This concession, however, is not decisive under the *Strickland* analysis applicable here.

"[R]efraining from objecting to avoid irritating the jury is a standard trial tactic," particularly during opposing counsel's closing argument. *Bennett v. Angelone*, 92 F.3d 1336, 1349 (4th Cir. 1996). I cannot find that Saliba's decision not to object in this instance was unreasonable. Anderson's attorney had expressed appreciation on behalf of the defense team for the prosecutor's restraint in raising objections during the trial, and defense counsel returned the courtesy.[18] Moreover, as stated, I had repeatedly advised jurors that they were not to consider the attorney's statements as evidence.

Finally, Saliba reasonably could have believed that the misstatement would not materially confuse the jury. Saliba's own closing argument had highlighted the fact that Mumphrey's testimony, at most, vaguely referenced a possible, one-time distribution to King without any stated drug amount involved. In light of three days of witness testimony and other evidence that jurors had already heard, I find no reasonable probability that absent Saliba's failure to object to the prosecutor's

[17] Kerry Lee, rather than Mumphrey, had testified that he sold "a set of crowns, quarters" of crack cocaine to King a few times. (Tr. 71, May 28, 2009, Case No. 1:08CR00024, ECF No. 2404.)

[18] Anderson's attorney stated, "Sometimes jury trials can be extremely full of conflict and bad tensions, and the jury can feel it in the court room. Mr. Lee hasn't made any unnecessary objections against us, *we haven't against him*, and it's been a courteous atmosphere." (Tr. 37, May 29, 2009, Case No. 1:08CR00024, ECF No. 2380) (emphasis added).

minor misstatement regarding Mumphrey's testimony on drug quantity, the outcome of the trial would have been different. This claim fails under both prongs of *Strickland*.

e. *Jury Issues.*

In Claims C(12) and C(13), King asserts that editing the verdict form and responding to the jury's request to review evidence were impermissible ex parte communication with the jury, to which counsel should have objected. I find no merit to these claims under either prong of *Strickland*.

The defendant has a right to be present during "every trial stage." Fed R. Crim P. 43(a)(2). Not all technical violations of this right warrant an objection, however. *See, e.g.*, *United States v. Parsons*, 993 F.2d 38, 41-42 (4th Cir. 1993) (holding that court's ex parte inquiry whether jury was "making progress" was a harmless error); *United States v. Harris*, 814 F.2d 155, 157 (4th Cir. 1987) (finding that court's response to jury query outside defendant's presence was harmless error).

Saliba objected to the original verdict form that erroneously asked the jury to state whether 500 grams or more of cocaine was attributable to King, and the court corrected this error. Counsel reasonably could have believed that King had nothing to gain thereafter by raising any objection. Moreover, King fails to show

any reasonable likelihood that the outcome of the trial would have been different if Saliba had objected.

f. *Sentencing Guideline Issue.*

King contends in Claim C(14) that counsel should have moved for an adjustment of his sentence under USSG § 5G1.3, because the offense conduct relating to two undischarged state prison sentences was deemed relevant to the federal charges. This claim fails under both facets of the *Strickland* analysis.

Section 5G1.3(b) applies only if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction" and "was the basis for an increase in the offense level for the instant offense." When these prerequisites exist, then

> (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and
>
> (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

USSG § 5G 1.3(b). By the plain terms of the guideline, however, if the offense conduct related to the state charges did not cause an increase in the defendant's offense level, no adjustment of the federal sentence under § 5G1.3 is warranted. *See, e.g., United States v. Connor*, 273 F. App'x 245, 247 (4th Cir. 2008) (unpublished) (finding that counsel not ineffective for failing to move for

downward departure under § 5G1.3 because state offense conduct did not increase federal offense level).

King fails to demonstrate that the state offense conduct increased his offense level. I calculated King's Base Offense Level under the Career Offender guideline, based on his prior convictions. Therefore, the state offense conduct and related drug amounts did not have any effect on this calculation.[19] As such, Saliba had no valid objection or argument for a downward departure under § 5G1.3(b), and his omission of such arguments was neither deficient representation nor prejudicial to King's case at sentencing.

*g. Appellate Review of Career Offender Status.*

Although Saliba had argued at sentencing that King's prior North Carolina convictions should not count as predicates for Career Offender status, he did not raise this argument on appeal. In Claim C(15), King asserts that this omission constituted ineffective assistance and serves as cause to excuse his default of Claim A(1). He also argues that his now-unlawful sentence, calculated with reference to the Career Offender guideline, constitutes actual prejudice under *Frady*. I cannot so find.

[19] Moreover, I find no reasonable argument that the drug amounts related to King's state convictions would have increased his offense level even if I had found that he was not subject to the Career Offender enhancement. King's PSR, based on testimony and statements by his coconspirators, calculated that King's offense involved more than 400 grams of crack cocaine. The state court convictions were based on controlled drug transactions involving .5 and .76 grams of crack cocaine.

The Sixth Amendment right to effective assistance of counsel extends to the defendant's direct appeal of his criminal conviction. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). However, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal, as 'there can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.'" *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (en banc) (quoting *Jones v. Barnes*, 463 U.S. 745, 752 (1983)). Therefore, to succeed on a claim that appellate counsel provided ineffective assistance, the defendant must show (a) that counsel's decision to omit an issue from the appeal was objectively unreasonable and (b) a reasonable probability that, absent this error, the defendant would have prevailed on appeal. *Bell*, 463 U.S. at 164.

Appellate counsel enjoys a "presumption that he decide[s] which issues were most likely to afford relief on appeal," and to rebut that presumption, the defendant must demonstrate that "ignored issues are clearly stronger than those presented." *Id.* (internal quotation marks and citations omitted). An attorney's failure to anticipate a new rule of law or to make an argument not forecast from existing case law cannot be found constitutionally deficient. *United States v. McNamara*, 74 F.3d 514, 516 (4th Cir. 1996) (finding counsel not ineffective for not preserving issue at trial based on Supreme Court's grant of certiorari in similar case).

At the time of their appeal, Morton and King had prior convictions that qualified as drug felonies for sentence enhancement purposes, because these offenses were punishable by more than one year under the controlling circuit precedent in *Harp*, 406 F.3d at 246. Both Morton and King were thus subject to the mandatory minimum sentence of 10 years under § 841(b)(1)(B), which applies to a defendant who has one or more prior drug felony convictions.[20]

Morton's counsel argued on appeal that Morton's prior North Carolina drug conviction did not qualify as a predicate for a mandatory minimum sentence under § 841(b)(1)(A), because Morton could not have been sentenced to more than 10 months in prison for that conviction. Saliba states that he considered making this argument on King's behalf, but decided it was without merit. I agree.

Even after *Simmons*, King's 1993 conviction qualifies as a felony for purposes of the 10-year mandatory minimum under § 841(b)(1)(B). King received a suspended sentence of 24 months for this offense. The fact that the North Carolina court chose to suspend that sentence does not change the fact that King's offense was punishable by more than one year in prison so as to meet the definition of a felony under 21 U.S.C. § 802(44). *See Hazel v. United States*, No. 2:05-cr-

[20] King states in his submissions that Saliba failed to inform him about the Sentencing Enhancement Information filed by the government. King does not clearly identify this issue as a separate claim of ineffective assistance, however. In any event, because he fails to demonstrate any reasonable probability of a different outcome absent this alleged error, any such claim fails under the prejudice prong of *Strickland*.

0722, 2012 WL 2357663, at *3 (D.S.C. June 20, 2012) (holding that *Simmons* did not apply where defendant "was subject to more than one year of imprisonment . . . though those sentences were suspended"), *appeal dismissed*, 478 F. App'x 771 (4th Cir. 2012) (unpublished). Moreover, King's 1993 conviction pre-dated the enactment of North Carolina's Structured Sentencing Act, the basis of the *Simmons* holding. *See United States v. Harris*, 458 F. App'x 297, 299 (4th Cir. 2011) (unpublished). Thus, Saliba's decision to omit this claim from King's appeal was neither deficient representation nor prejudicial under *Strickland*.

Saliba also could reasonably have believed that King's current challenge to his Career Offender status was without merit, in light of *Harp*. I cannot find Saliba's representation deficient because he did not raise a claim that had no merit under controlling law or because he failed to forecast the content of the *Simmons* decision and seek relief under it for King. *McNamara*, 74 F.3d at 516. Thus, Claim C(15) fails under *Strickland*.

Moreover, even if I were to find Saliba's appellate claim selection to be objectively unreasonable, King has shown no reasonable probability that a Career Offender challenge would have succeeded on appeal. Although I relied on King's Career Offender status to calculate his advisory guideline custody range, I expressly found that a sentence within that range was not appropriate for his offense conduct and did not rely on that guideline as a starting point from which to

calculate the appropriate term of confinement for his offense. Independent from the Career Offender context, I considered King's prior criminal history with controlled substances, the family support and personal abilities that he squandered by pursuing unlawful activities, the extent of his role in the charged conspiracy, and the sentences I had imposed on his coconspirators. Given all of these circumstances, I chose to sentence King to 180 months because I felt that term of confinement addressed the sentencing concerns under § 3553(a) and was a fair penalty for his level of culpability. The *Simmons* decision does not alter my determination that 180 months was the appropriate penalty for King's criminal activity.

Although I did not make a drug quantity finding at King's sentencing, the numbers support my conclusion that he has not shown actual prejudice. King faced a statutory maximum sentence of life in prison. 21 U.S.C. § 841(b)(1)(B). With Career Offender status, King's Base Offense Level was 32 and his criminal History Category was VI, resulting in an advisory custody range of 360 months to life in prison. Without Career Offender status, King's PSR found that he should be accountable for 419.8 grams of crack, giving him a Base Offense Level of 32, with a Criminal History Category of V, resulting in a custody range of 188 to 235 months. King disputed the PSR's drug quantity finding, arguing that 300 grams of that total was based on a codefendant's statement who had not testified at trial.

Discounting King's drug quantity by that amount, even if I had held him accountable for only 119 grams of crack cocaine, his Base Offense Level would have been 30, resulting in a custody range of 151 to 188 months. His ultimate sentence imposed fell squarely within this range.

For these reasons, I conclude that the court of appeals would have affirmed King's sentence, regardless of an appellate challenge to his Career Offender status. Based on my express finding that the Career Offender guideline range was inappropriate for King and my citation of multiple other factors that guided my determination of his sentence, a Career Offender challenge would likely have been dismissed as harmless error. *See, e.g.*, *United States v. Foreman*, No. 13-4022, 2014 WL 945324, at *5 (4th Cir. Mar. 12, 2014) (unpublished) (dismissing challenge to Career Offender status as harmless error, where sentencing judge indicated Career Offender guideline not appropriate and based sentence on other factors); *United States v. Savillon-Matute*, 636 F.3d 119, 123 (4th Cir. 2011) ("[I]t would make no sense to set aside [a] reasonable sentence and send the case back to the district court since it has already told us that it would impose exactly the same sentence, a sentence we would be compelled to affirm.") (internal quotation marks and citation omitted).

Thus, I find that King's ineffective assistance allegation in Claim C(15) fails under both facets of the *Strickland* analysis.

This meritless ineffective assistance claim cannot serve as cause to excuse King's default of his *Simmons* claim on appeal. *Edwards*, 529 U.S. at 451. In any event, because I would have imposed the same sentence on King, he cannot show actual prejudice as necessary under *Frady*. 456 U.S. at 166-70.

A panel of the Fourth Circuit recently held that "erroneous application of the career offender enhancement amounts to a fundamental miscarriage of justice that can be corrected on collateral review." *Whiteside v. United States*, No. 13-7152, 2014 WL 1364019 at *11 (4th Cir. Apr. 8, 2014). Because I am convinced that I would have imposed the same sentence on King even in light of *Simmons,* I do not find that a failure to correct his Career Offender designation on collateral review works any fundamental miscarriage of justice so as to excuse his procedural default.

Thus, I will grant the Motion to Dismiss as to Claim C(15) as without merit and as to Claim A(1), as procedurally barred and without a sufficient showing of cause and actual prejudice, as required to circumvent the default.

h. *Other Alleged Errors by Saliba*.

In Claims C(16) and (17), King faults attorney Saliba for failing to generate a petition for a rehearing en banc or a writ for certiorari or to properly withdraw as appellate counsel. These claims state no constitutional ground for habeas relief. Although "indigent defendants pursuing appeals as of right have a constitutional

right to a brief filed on their behalf by an attorney, that right does not extend to forums for discretionary review." *Austin v. United States*, 513 U.S. 5, 8 (1994) (citation omitted). In a proceeding where the prisoner has no constitutional right to counsel, he has no claim that counsel's assistance was constitutionally ineffective. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).

Courts have held that petitions for rehearing and petitions for writs of certiorari are both forms of discretionary review, in which a habeas litigant does not have a constitutional right to counsel's assistance and, as such, cannot seek collateral review on the ground that counsel was constitutionally ineffective. *See, e.g.*, *White v. United States*, No. 7:08CR54, 2013 WL 1497579, at *3-4 (W.D. Va. Apr. 11, 2013) (finding that "a petition for rehearing or rehearing en banc is a discretionary appeal and thus there is no constitutional right to counsel to pursue a petition for rehearing"); *Jackson v. United States*, 319 F. Supp. 2d 672, 677 (E.D. Va. 2004) ("As the petitioner had no constitutional right to counsel beyond his direct appeal, any error of [counsel] in failing to inform the petitioner of the denial of certiorari does not amount to ineffective assistance of counsel"), *aff'd*, 107 F. App'x 346 (4th Cir. 2004) (unpublished). Because King had no constitutional right to counsel in pursing rehearing or certiorari review, I must deny relief as to his constitutional claims regarding Saliba's alleged deficiencies during these post-conviction proceedings.

Nevertheless, King may seek relief through the Criminal Justice Act, 18 U.S.C. § 3006A. In *Wilkins v. United States*, 441 U.S. 468 (1979), the Supreme Court provided relief under the applicable Criminal Justice Act Plan ("CJA Plan"), for an out-of-time pro se petitioner whose counsel never filed a petition for certiorari despite assurances that he had done so. The CJA Plans for all of the courts of appeal then provided that a court-appointed lawyer must, if his client wished to seek further review in the Supreme Court, represent that client in filing a petition for certiorari. *Id.* at 469. Given counsel's admitted shortfall from this statutory obligation, the Court remanded the case to allow reentry of the judgment and pursuit of a timely petition for a writ of certiorari. *Id.* at 470.

Clearly, even if I find that Saliba failed to fulfill his duties under the CJA Plan with regard to King's certiorari efforts, this court has no power to vacate the court of appeals' judgment as the Supreme Court did in *Wilkins*. This court may, however, make factual findings about counsel's effectiveness under the CJA Plan, which the defendant may then use to petition the court of appeals for recall of the mandate and reentry of its judgment to allow him to pursue a timely certiorari petition. *See, e.g.*, *United States v. Tejeda-Ramirez*, 380 F. App'x 252, 254 (4th Cir. 2010) (unpublished) (vacating district court's denial of § 2255 relief and remanding for factual findings on claim that counsel was ineffective under CJA

Plan in failing to advise defendant of adverse judgment on appeal) (citing *Proffitt v. United States*, 549 F.2d 910, 913 (4th Cir.1976).

The Fourth Circuit's CJA Plan for furnishing counsel to indigent defendants provides, as it did at the time of King's appeal, that appellate counsel, including retained counsel, "shall continue to represent his client after termination of the appeal unless relieved of further responsibility by [the court of appeals] or the Supreme Court." CJA Plan, Section V(2). After an adverse judgment on appeal, if the defendant asks counsel to pursue a petition for a writ of certiorari,

> and in counsel's considered judgment there are grounds for seeking Supreme Court review, counsel shall prepare and file a timely petition for such a writ and transmit a copy to the defendant. . . .
>
> If the appellant requests that a petition for writ of certiorari be filed but counsel believes that such a petition would be frivolous, counsel may file a motion to withdraw with this court wherein counsel requests to be relieved of the responsibility of filing a petition for writ of certiorari.

*Id.*

Saliba states:

> Mr. King and I discussed the appeal, the contents of the appeal brief, the upcoming oral argument, and the procedure (including filing a writ of certiorari) in the event the Fourth Circuit Court of Appeals ruled against him. He did in fact request that I file all possible appeals on his case. Ultimately, the Fourth Circuit Court of Appeals reversed the appeal in part, affirmed in part, and remanded Reginald Morton's case to the trial court for resentencing. Unfortunately, I did not timely file a petition for writ of certiorari, as I was of the opinion that said filing was not timely until all elements of the joint appeal were adjudicated. I have since determined that this is not correct. Mr. King

should be entitled to a delayed petition for a writ of certiorari to the United States Supreme Court.

(Saliba Aff. 3, Feb. 19, 2013, ECF No. 212-1.) Because King relied on Saliba's assurances that he would file for certiorari, King lost his chance to file a timely pro se petition.

I find from the record before me that Saliba failed to fulfill his obligations to King under the CJA Plan. He admits that, after a discussion of post-judgment review options, including certiorari proceedings, King asked him to pursue all possible review. Saliba also indicates that he intended to file a petition for a writ of certiorari and only failed to do so because of a procedural error: he miscalculated the filing deadline. Saliba did not move to withdraw, as the CJA Plan required him to do if he believed King's grounds were frivolous, and the government offers no evidence that Saliba so believed. Indeed, the government concedes that under *Tejeda-Ramirez*, 380 F. App'x at 254, I should make a factual finding, without an evidentiary hearing, that King was deprived of his right under the CJA Plan to appellate counsel's assistance in seeking review of the court of appeals decision.[21]

[21] King has filed motions seeking expedited review of this claim and others, in light of the government's concessions of fact. (ECF Nos. 220, 228 & 229.) Simultaneously, however, King continued to pursue his numerous remaining claims, including constitutional challenges to the validity of his conviction and sentence, which have required review of a lengthy record and complicated legal and procedural analyses.

As stated, this limited violation of the right to appellate counsel under the CJA plan is not a constitutional claim upon which I can grant relief under § 2255. King is advised, however, that he might use Saliba's affidavit and my findings here to support a renewed motion to recall the mandate. In the event the court of appeals grants such a motion and reenters its judgment, King might then pursue a petition for a writ of certiorari in the Supreme Court.[22]

i. *Cumulative Errors*.

In his final claim, King asserts that even if counsel's alleged errors, taken one by one, do not qualify as deficient representation, they may state a claim under *Strickland* if they constitute prejudicial error when taken cumulatively. This claim has no merit. An attorney's acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation." *Fisher v. Angelone*, 163 F.3d 835, 852-53 (4th Cir. 1998) (internal quotation marks and citation omitted).

---

Therefore, I found no justification to sever the action for expedited review of one or more claims separately before resolving the others. I will deny King's motions as moot.

[22] King also moves for appointment of counsel to assist him in this § 2255 action, in light of the government's factual concessions. (ECF No. 230.) For the reasons stated, however, I find from the record that King's claims do not warrant relief under § 2255. Therefore, I also find that the interests of justice do not require appointment of counsel in this action and will deny King's motion. In the event that the Fourth Circuit grants a petition for rehearing or the Supreme Court grants certiorari, King may move in those courts for appointment of counsel.

III

For the reasons stated, I find that King is not entitled to relief under § 2255, and I will deny his motion. A separate Final Order will be entered herewith.

DATED: May 13, 2014

/s/ James P. Jones
United States District Judge